(Decided June 28th, 1898.)

---

## MARION DUCKETT ET AL., TRUSTEES *vs.* THE NATIONAL BANK OF BALTIMORE.

*Trusts—Liability of Bank for aiding Trustee in Breach of Trust—Appropriation with Notice of Money belonging to Trust Estate to Trustee's Personal Indebtedness—Memorandum on Check—Bona fide Purchaser of Bonds.*

A party who knowingly, or with means of knowledge, aids a trustee in committing a breach of trust, is liable therefor to the trust estate.

As between *cestui que trust* and trustee and all persons claiming under the trustee otherwise than by purchase for valuable consideration without notice, all property belonging to the trust estate, however much changed in its nature, and all the fruits of such property, continue to be affected by the trust.

When a bank accepts from a trustee in payment of his personal indebtedness the check of a third party which shows upon its face that the money is due to the trustee in his fiduciary capacity, as trustee of a designated estate, the bank is affected with notice of the breach of trust and is liable to the trust estate for aiding the trustee in committing his wrongful act.

Equity has jurisdiction to enforce the liability of a party who receives trust property with knowledge that it is being disposed of in breach of trust.

C. held as trustee of an estate certain certificates of indebtedness of P. G. county. An Act of the Legislature of 1890 authorized the county to issue bonds in payment of this and other debts. The bonds were executed but were not legally issued, because purchasers objected to a proviso in the Act. This proviso was repealed by an Act passed in 1892, which required the bonds made under the Act of 1890 to be destroyed, before any should be issued under the Act of 1892. In 1891, C., the trustee, obtained from the county bonds to the amount of $12,500, in payment for the certificates of indebtedness so held by him. In the same year, the defendant bank loaned a sum of money to C. in his personal capacity, and accepted said bonds as collateral security. In 1892, the county desired to obtain these bonds in order to be authorized to issue the new bonds. The bank agreed to surrender them upon receiving payment of C.'s indebtedness to it. The bonds were delivered to the county treasurer and the bank received a check for $12,568, which stated upon its face to be " in full for amount due as assignee of H. W. C., sole trustee of Mrs. E. B.," together with a statement showing the amount of the county paper held by C. as trustee for Mrs. E. B. for certain years. The bank collected the check, paid C.'s indebtedness of $11,000 to it and paid out the balance upon C.'s individual checks. Upon a bill by substituted

trustees of the estate to make the bank liable for the amount so received, *Held:*

1st. That the bank had notice of the terms of the Act of 1890, and knew that the bonds it accepted as collateral security had not been regularly issued and had been given to C. in violation of the act, and that consequently in taking them the bank was not a *bona fide* purchaser of negotiable paper.

2d. That assuming that the bank had no notice that C. held the bonds as trustee until the receipt of the check, yet the memorandum on the check, as well as the accompanying statement, was notice to the bank that the money was due by the county to C. as trustee of the designated estate; and the bank consequently received the proceeds of the check as a trust fund and is liable for its misappropriation to C.'s personal indebtedness.

3d. That having such notice, it was the duty of the bank to refuse to accept the check and stand upon such title to the bonds as it might have against the county, and the surrender of the bonds did not give it the right to the money which it received with notice that it belonged to the trust estate.

4th. That the bank is liable to the trust estate for the amount of the check, with interest from the date of its receipt, less such sums as it may be shown were paid by C. for the legitimate purposes of the trust from the amount so received by him from the bank.

Appeal from a decree of the Circuit Court No. 2 of Baltimore City (STOCKBRIDGE, J.) dismissing the bill of complaint.

The cause was argued before McSHERRY, C. J., FOWLER, PAGE, ROBERTS, BOYD and PEARCE, J. J.

*Charles H. Stanley* and *David S. Briscoe* (with whom was *Marion Duckett* on the brief) for the appellants.

There can be no denial that the certificates of indebtedness for which this money was paid belonged and were a part of the *corpus* of the property in the hands of Clagett, as trustee, for Mrs. Bowling for life, and in

remainder to others, under the will of Mr. Bowling. Hence, any disposition of such certificates or anything given in lieu of them, whether bonds or money, for the individual benefit of Clagett, was a *devastavit*—inasmuch as all property belonging to a trust, however it may be changed or altered, and all the fruit of trust property continues to be subject to and affected by the trust. *Englar* v. *Offutt*, 70 Md. 78. Clagett undeniably used these trust funds as security to get money for his individual purposes, and this being a palpable *devastavit* on his part the only question seems to be this, viz.: Did the bank at any time participate with him in misapplying these funds with knowledge or notice of such misapplication? If it did this Court has held, the bank is a party to the breach of trust. *Duckett et al.* v. *National Mechanics Bank*, 86 Md. 400; *Gillespie's case*, 137 U. S. 411; *Bank* v. *Lange*, 51 Md. 144; *Stewart and Duffy* v. *Insurance Co.*, 53 Md. 578; *Lowry* v. *Bank*, 3 Banker's Magazine, p. 201; *Marbury* v. *Ehlen*, 72 Md. 216; *Albert's case*, 2 Md. 159.

Can there be any doubt that the bank did thus participate in the breach of trust when it received through its cashier the check set out in this case? Can there be any doubt that it did thus participate and profit by such breach of trust, when its cashier receipted that statement, took that check, collected the money and applied it first to pay the individual note due by Clagett to the bank, and deposited the balance to his individual credit, and then after full notice that the money was a trust fund belonging to the Bowling estate allowed Clagett to draw and apply the balance to his individual purposes?

If it be contended that the bank in the first instance took the bonds of 1890 as security for the note of Clagett, without knowing that they belonged to the trust estate, and is therefore innocent in the original transaction, that does not relieve it from liability, because when it got the money due on the certificates of indebtedness, which was the debt paid by the sale of the bonds of 1892 and not the debt intended to be

created by the Act of 1890, it surrendered the bonds of 1890, and allowed the new bonds to be issued only upon condition that the money due the trust estate of John D. Bowling be placed in its hands and then deliberately applied the money to pay the debt due by Clagett to it and gave the balance to Clagett and aided him in a further *devastavit.* Surely, this makes it responsible, even if innocent in the first transaction. But it cannot claim to be thus innocent. When it took the bonds of 1890 it knew they were not negotiable—it knew the provisions of the act which authorized them—that Clagett was the president of the Board of County Commissioners, and that he had no right to use them as collateral security for a private transaction of his own. If it had then refused to aid him in a plain and palpable malfeasance of office, the loss to the trust estate could not have occurred. *Swift* v. *Williams,* 69 Md. 237. The fact that the County Commissioners may be liable to the appellants does not, in any degree, relieve the bank of its liability, if upon the facts it can be held to have participated in the breach of trust complained of. There is, in all cases of this description, no question of primary or secondary liability, and all parties who take part in a breach of trust with knowledge of such a breach, or with notice which is equivalent to such knowledge, are equally responsible. Accordingly, if the bank upon the facts of the case is justly liable for a participation in the wrongful and illegal act of the Board which gave to Clagett the bonds of 1890, or in the wrongful and illegal act of the subsequent Board which drew and transmitted to the bank the check in question, it is liable to the appellant quite irrespective of the fact that the County Commissioners are also liable.

*William A. Fisher* and *Allan McLane* (with whom was *James L. McLane* on the brief) for the appellee.

As a matter of fact there is no evidence whatever in the case of the alleged breach of trust by Clagett, as trustee. There was a breach of duty and trust by him, but it was that of a County Commissioner. He had

borrowed about $8,000 from the trust estate, and had assigned to it his claim against the county, or what is described as county paper, several years prior to the transactions in question.   And he assigned the paper to himself and his two co-trustees under the will of John D. Bowling, and the title to the county paper became vested in the trustees.   There is no evidence that any assignment was ever made by him of this claim against the county to the bank.   It still remains an asset of the trust estate held by the plaintiffs.

It is apparent that Clagett obtained no title to the bonds as trustee under the Bowling will.   The bonds had no vitality in fact, but if title can be predicated of them at all, it was in the Commissioners of whom he was one, and when he unlawfully took them, he was, as the bill asserts, guilty of " official malfeasance," and he *held the bonds still for the County Commissioners.*   If, therefore, he was guilty of any breach of trust in delivering them to the bank as collateral on a loan made to him, the breach was of his trust as a County Commissioner.   The indebtedness of the county to the trust estate upon the county paper remained entirely unaffected by the transaction.   If it was the intention on June 10, 1891, that the bonds should be accepted in payment of the county's debt and not as collateral to it, it was not such payment in law, because the act would have been unlawful and futile.   He could not have received the bonds in payment without the authority of the Court, under whose order he was acting.

It is impossible to predicate any claim against the bank on the basis of any supposed interest of the trust estate in the bonds, because no title in them passed out of the County Commissioners to Clagett as trustee. The effort to support the claim must therefore be made upon the ground only that the bank received the check which was made payable to it as the *assignee* of Clagett, trustee.   In other words, it must be upon the theory that the money is the trust fund which can be followed in the hands of the bank for this reason.

It is not denied that trust property, either in its orig-

inal form, or in any altered or substituted form, may be followed and taken from the hands of an unfaithful trustee, or from those of any other person who has taken the property with knowledge that it is affected by a trust. But this principle has no application in this case for several reasons. 1st. It has no application because the money in the hands of the bank was not the trust fund. The indebtedness of the county was the trust property, and it remains the trust property still, and the money paid to the bank is unaffected by it. There is no occasion for resort to the idea of substitution. The effort by the Court of Equity is always to keep or to place the estate in the original position. *Hill on Trustees* (522). It is impossible that there can be a county indebtedness still existing which is the trust property, and at the same time that the money paid should be treated as trust property. Has the money been substituted for the county indebtedness, and the indebtedness extinguished? Evidently it has not been extinguished. The County Commissioners could not defend against the claim on the ground that the payment to the bank had extinguished the debt. They had knowledge of the trust, and of the fact that it was under the control of the Circuit Court of the county in the equity case mentioned. No authority of the Court was procured for any assignment of the claim to the bank, none was in fact made to the bank, and no demand was made on the commissioners on behalf of the bank upon this ground. The demand was entirely on the basis of its holding of the bonds. Clagett was not present when the payment was made, and had nothing whatever to do with it. Hence the circumstances under which the payment was made are not such as to operate legally an extinguishment of the indebtedness of the county to the trust estate.

2d. There is no evidence of any circumstances amounting to a ratification of the acceptance of the bonds or of the payment, so as to substitute the bank, which, on the plaintiff's theory, unlawfully received the money, for the real debtor, the county, which unlawfully

paid it. Who could ratify an act to convert a fixed indebtedness into a claim for money in the hands of a person to whom the debtor has paid it without authority?

Under the theory set up in the bill, the payment to the bank was unlawful, it had no right to receive the money, and was not in fact assignee of Clagett, although it received the money in that capacity. Of course, the only grounds upon which it could be pretended that the money in the hands of the bank is a trust fund, would be that it was lawfully and properly paid, or that, being unlawfully and improperly paid, there has been a ratification, and that hence the money may be demanded as if there had been a lawful payment. The familiar rule as to ratification, however, requires that the act done must be ratified, if at all, in all its parts, and with all its consequences. *Wharton on Agency*, sec. 72. Thus considered, the proposition would be *felo de se* in this case. If there is a ratification, it carries with it the proposition that the bank was in fact the lawful *assignee* of Clagett as trustee, with the right to the money. Besides, if there is ratification, it must be of an act purporting to have been done on behalf of the ratifying party. *Wharton on Agency*, secs. 62 and 63. But in this case, the evidence shows that the bank was acting on its own behalf only, and the language of the check, if that is to be regarded, excluded the idea of agency, and stated that the bank was to receive it to the exclusion of the trust as *assignee*.

But, apart from the proposition already suggested, the bank had no knowledge that Clagett was dealing unlawfully with any trust property. There were no circumstances to suggest it. *Grafflin, trustee v. Robb et al.*, 84 Md. 451; *Marion Duckett et al., trustees v. The National Mechanics Bank*, 86 Md. 400.

Although it is true probably that no title to the bonds could have been successfully asserted against the county, nevertheless, the bank held possession of them innocently and for value. It was absolutely necessary that the county should procure the possession of them, in

order to put out the issue under the Act of 1892. The money was paid for the bonds, and the bank gave them up without suit in consideration of the payment. Mr. Perkins ought not to have accepted the check in the form adopted for it on behalf of the bank. But the bonds having been parted with by the bank, under the circumstances stated, it had the right to obtain the money out of the bank account of the commissioners, no matter what was the form of the order given for its withdrawal, and no questions could arise out of the act of doing so except between the county and the bank.

There is nothing in the wording of the check of the County Commissioners to the bank to earmark the fund as a trust fund, or to put the payee upon inquiry. The check in question is " an unconditional order on a bank to pay a specified sum of money to a person named, or order, on demand." 2 *Morse on Banks and Banking,* secs. 362, 364, *et seq.* The words, " in full for amount due as assignee of H. W. Clagett, sole trustee of Mrs. Elizabeth Bowling," are merely a memorandum placed upon the check for the convenience of the drawer, and do not alter or limit its import as a *check.* Such a memorandum was not a " notification to the bank that the funds were impressed with a trust that would be invaded by their being carried to the credit of J. Thos. Smith, cashier," as directed by the language of the check. They imposed no duty on the bank, and operated only to subserve the convenience of the drawer. *State National Bank of Springfield* v. *Dodge,* 124 U. S. 333; *Duckett et al., trustees* v. *The National Mechanics Bank,* 86 Md. 400.

PEARCE, J., delivered the opinion of the Court.

John D. Bowling of Prince George's County by his will bequeathed to three trustees named therein certain funds to be held in trust for the purpose of securing to his wife Elizabeth Bowling, the annual sum of $5,000 during her life, and in further trust after her death to distribute the same among the testator's children and

grandchildren, as directed by the will. The appellants were by proper proceedings in the Circuit Court for Prince George's County appointed trustees in the place and stead of Henry W. Clagett (the survivor of the three testamentary trustees), who was removed for breach of his trust, and these proceedings were instituted by the appellants in the Circuit Court No. 2 of Baltimore City, for the purpose of recovering from the National Bank of Baltimore, the sum of $12,568.55, which they allege constitutes part of the above trust fund, and to have been knowingly and wrongfully diverted therefrom by the defendant and applied by it to the payment of a debt due to the bank by Clagett in his individual capacity. It will be necessary to state the principal facts upon which this controversy arises, in order to a satisfactory discussion of the legal principles upon which it must be determined.

In June 1891, while Clagett was sole trustee for Elizabeth Bowling he held among the assets of that fund certain certificates of indebtedness of Prince George's County, amounting at that time, with interest, to about $12,000, which was originally due to Clagett individually, but which some time prior to 1891, had been by him assigned on the books of the county, to the three testamentary trustees of Mrs. Bowling. By the Act of 1890, ch. 121, the Commissioners of Prince George's County were authorized to issue coupon bonds to the amount of $80,000, of which $50,000 was to be applied to the payment of debts due by the county, among which was this debt due the trust fund of Elizabeth Bowling. By the terms of that Act the bonds could only be disposed of to the highest bidder " at a public letting," and by reason of a provision that the interest coupons could only be paid on presentation, in connection with the bond, it was found no sale could be effected. The Act of 1892, ch. 535, repealed and re-enacted ch. 121 of 1890, omitting the provision as to the coupons which had defeated the sale, and required that all the bonds provided for by the Act of 1890, should be counted and destroyed by the County Com-

missioners, before the bonds provided for by the Act of 1892 should be put on the market. Clagett was President of the County Commissioners on June 10th, 1891, and on that date, the following order was passed by the Board: "June 10th, 1891. Ordered that H. W. Clagett, trustee, be allowed 1890 bonds for his Co. paper on file, for the years 1874, 1875, 1876 and 1877, and that these bonds be exchanged for other bonds, when issued, with 6% int. from date." He signed as President and caused the clerk to sign and issue $12,-500 of these bonds. In August 1891, Clagett borrowed from the Bank of Baltimore $11,000, upon his individual note, and delivered these $12,500 bonds to the bank as collateral security for this loan. Shortly after this, a new board of Commissioners was elected, and after the passage of the Act of 1892, on counting the bonds provided for by the Act of 1890, it was found that $12,500 of them were missing and the new bonds could not be issued until all the old were called in and destroyed. After some delay, it was ascertained that the missing bonds were in the possession of the Bank of Baltimore, as collateral to the loan to Clagett, and when demand was made for them, the bank refused to surrender them until the loan was paid. Finally, the bank delivered the bonds to James T. Perkins (then treasurer of Prince George's County, and through whom Clagett had negotiated the loan) with the understanding that he should surrender them to the Commissioners upon payment of Clagett's note. The testimony of Thomas E. Williams, Clerk to the County Commissioners in 1892, shows that Perkins delivered these bonds to him upon receipt of a check for $12,-568.55 and a statement of the amount due by the county to Clagett as trustee. This check read as follows:

UPPER MARLBORO, Md., Aug. 1st, 1892.

The Citizens' National Bank of Laurel, pay to the order of J. Thomas Smith, Cashier Nat. Bank of Baltimore $12,568.55, twelve thousand five hundred and sixty-eight dollars and fifty-five cents, in full for amount

due as assignee of Henry W. Clagett, sole trustee of
Mrs. E. Bowling, from 1874 to 1881, inclusive.

> (Signed) WILLIAM BERRY, President,
>                 D. T. SHERRIFF,
>                 JOHN L. RAWLINS,
>                         County Coms."

Countersigned, THOMAS E. WILLIAMS, Clerk.

The statement mentioned as delivered with the check,
was headed as follows:

" Statement showing the amount of paper of Prince
George's Co. held and owned by Jno. Bowling, H. W.
Clagett and J. K. Roberts, for Mrs. E. Bowling for the
years 1874, 1875, 1876, and 1877, now held by Henry
W. Clagett, sole trustee."

Then follows each item of the account, with interest
added to July 1st, 1892, aggregating $12,568.55. Per-
kins having surrendered the bonds when the above
check and statement were delivered to him, then deliv-
ered the check and statement to J. Thomas Smith,
Cashier of the National Bank of Baltimore, who then
signed the receipt at the foot of the statement which
read as follows:

> " BALTO., Aug. 2, 1892.

Received from Jas. T. Perkins, check on Citizens' Nat.
Bank, Laurel, drawn by Prince George's County Com-
missioners for $12,568.55.

> J. THOMAS SMITH, Cashier."

This statement, so receipted, was then returned to
the Commissioners; the check was endorsed for collec-
tion by the cashier, and was collected by the bank.
Out of the proceeds, Clagett's note was paid, and the
balance, $1,563.35, was carried to the credit of Clagett
upon the books of the bank, and was subsequently paid
out upon his individual checks.

A decree *pro confesso* was entered against Clagett.
The bank demurred to the whole bill on the ground:
1st, That the bill did not state a case entitling the plain-
tiff to any relief in equity. 2nd, That there was an ade-

quate remedy at law, and: 3rd, That plaintiffs had not
shown themselves entitled to the discovery prayed.
This demurrer was overruled by JUDGE WICKES.  The
bank then answered, admitting substantially most of
the matters of fact alleged in the bill, but denying all
liability, and alleging that it took the bonds in the usual
course of business, without knowledge or suspicion that
Clagett's title thereto could be questioned, and alleging
also that the proceeds of the loan were largely applied
by Clagett to the legitimate uses of the trust, upon his
checks drawn on said proceeds.

The bank also alleged, in answer to certain para-
graphs of the bill, that if Clagett had no right to pledge
said bonds, or to assign said claim against the county,
as the plaintiffs contended he had not, then the plain-
tiffs had been in no wise injured, and that in any event
there was an adequate remedy at law, and prayed the
benefit of these defences as fully as if presented by de-
murrer.  Testimony was taken, and after argument the
bill was dismissed by JUDGE STOCKBRIDGE and this
appeal was taken.  No opinion having been filed, we
are unfortunately without the advantage of knowing
the reasons which led to the decision rendered by the
learned Judge.  We have no doubt that the case is one
of equitable cognizance, and that the demurrer to the
jurisdiction of the Circuit Court was properly overruled.
The authorities will be found amply cited in *Swift* v.
*Williams*, 68 Md. 237; in *Central Nat. Bank* v. *Connecticut
Mutual Ins. Co.*, 104 U. S. 54, and in *Union Stock Yards
Nat. Bank* v. *Gillespie*, 137 U. S. 411.

The main question for determination is, whether upon
the facts of the case, the bank can be held liable to the
appellants for the amount of the check wrongfully made
and delivered by the County Commissioners to the
cashier of the bank and appropriated by it to its own
use, and to the personal use of Clagett.  The funda-
mental principles upon which the solution of this ques-
tion must depend have received the careful considera-
tion of this Court in the recent case of Duckett and
others, trustees, against the Nat. Mechanics' Bank of

Baltimore, decided December 1st, 1897 (86 Md. 400), and their application was very accurately discriminated in reference to the two checks then in question. In that case it was said, " There can be no dispute that, as a general principle, all persons who knowingly participate, or aid, in committing a breach of trust are responsible for the wrong, and may be compelled to replace the fund which they have been instrumental in diverting, and there is in such instances, no primary or secondary liability as respects the parties guilty of participating in the breach of trust, because all are equally amenable." We do not reproduce this passage here as enunciating a new principle, for it had been expressly so held both in England and in this country, as in *Wilson* v. *Moore*, 1 Mylne & Keene 146; *Knatchbull* v. *Hallet*, L. R. 13 Ch. Div. 696, and in *Swift* v. *Williams*, 68 Md. 249; but we repeat it, because its language shows that not only all those who originate and perform the act which is designed to work the breach of trust are compelled to see it righted, but those also who have been in any manner " instrumental " in the resulting diversion of the fund. Under these authorities therefore, and equally we think upon principle, if it appears that the bank knowingly participated in the primary act which led to the breach of trust, or was instrumental through its own subsequent act in perfecting the breach, the way to which was opened by Clagett's act, it should be required to restore the trust fund to its original condition. Now there can be no denial that the certificates of indebtedness, in the attempted discharge of which this check was drawn and paid, constituted part of the *corpus* of this trust. These certificates were assigned upon the books of the County Commissioners to the trustees and they were returned by them in their report to the Court as trust assets. When in June 1891, Clagett was allowed bonds for these certificates, these bonds—if they had any validity in his hands—were impressed with the same trust which characterized these certificates. The language of the order would indicate that the purpose was to substitute the bonds for the

certificates, but from the fact that the certificates were not cancelled, and from the subsequent reference to them in the statement of the debt, it is apparent that the bonds were received merely as collateral, but in either event the trust equally attached so far as Clagett was concerned, and any disposition of the bonds by him for his personal benefit, was a clear *devastavit* by him, since "as between cestui que trust, and trustee, and all persons claiming under the trustee, otherwise than by purchase for valuable consideration without notice, all property belonging to a trust, however much it may be changed or altered in its nature, or character, and all the fruits of such property whether in its original, or in its altered state, continues to be subject to, or affected by the trust." *Pennell* v. *Deffell*, 4 De Gex, McN. & G. 372; *Englar* v. *Offutt, trustee*, 70 Md. 78. But unless the bank, knowingly, or with means of knowledge, participated in a breach of trust or profited by the fruits of a fraud, it cannot be held responsible to the trust estate, and this liability must be determined from the evidence in the record.

By the terms of the Act of 1890, the bonds authorized by it were required to be sold to the highest bidder, " at a public letting," after a prescribed advertisement in the cities of Baltimore and Washington. It does not appear from the record whether such advertisement was, or was not, made, but it does appear that none of the bonds were sold. They have all been destroyed, and no evidence was offered of their form or contents, but as municipal obligations they must have shown upon their face, a reference to the Act of Assembly under which they were authorized, and we are of opinion, *upon the peculiar facts of this case*, as they appear in the record, that the bank must be charged with notice of the terms of that Act, and must be held to have dealt at its peril in taking these bonds as collateral security for the loan; since participation in a breach of trust may be the result of negligence, or mere oversight, as well as of wilful or deliberate fraud. It is true that municipal obligations such as these bonds are placed by numerous decisions

upon the footing of negotiable paper, *and when issued by competent authority,* pass into the hands of a *bona fide* purchaser, for value, and before maturity, free from any infirmity in their origin, and that only bad faith on the part of the purchaser will impair his title. *Murray* v. *Lardner,* 69 U. S. 110; *Cromwell* v. *Sac Co.,* 96 U. S. 51.

It is not necessary however, to inquire whether these bonds, under the circumstances of this case, could be held to have been issued by competent authority, because the doctrine above stated is applicable only to obligations *actually issued,* however wrongfully or improperly issued, and until actually issued, *in apparent right* though in actual wrong, they are not negotiable or valid securities; and the proof is incontestable that Mr. Devries, the president of the bank, knew when he took these bonds that they had never been sold and issued, and that they were not then negotiable securities. He states in his testimony that in July 1891, Jas. T. Perkins called at the bank and stated that the Commissioners of Prince George's County owed Mr. Clagett quite a large sum of money which they were not in condition to pay and inquired if a loan of $11,000 would be made to Mr. Clagett upon $12,500 of 4 per cent coupon bonds of the county. He says Perkins then told him " that the bonds were *not negotiable,* and that the Commissioners had *not been able to dispose of them;* that they had decided it was useless to attempt to sell them, and would apply to the next Legislature for permission to issue a new bond, *one that would be negotiable;* but that the Commissioners would give Mr. Clagett $12,500, of the bonds for the purpose of negotiating the loan, and when the new bonds were issued, the County would either give Mr. Clagett new bonds, which he could either substitute to the bank for the loan, or he would pay the loan off; and that Mr. Clagett was a gentleman of large means, and was perfectly responsible outside of the collateral; and that he was at that time President of the Board of County Commissioners of Prince George's County." Mr. Devries further testified that he told Perkins he thought the

bank would make such a loan, but that he would have to consult the Board of Directors; that he did so, and they authorized the loan; that he notified Mr. Perkins and that shortly after this Clagett came up with the bonds amounting to $12,500, and gave his note for $11,000, and the bonds as collateral. The case thus presented is totally different from all those in which the doctrine above stated was applied. In the present case, entirely apart from any constructive or implied notice of the terms and requirements of the statute, the bank, through its president, had actual and explicit notice that the statute required the bonds to be sold, and that they had not been sold but had been delivered to Clagett in direct violation of the authority of the statute. This being so, how then can it be contended that the bank occupied the position of an innocent purchaser of a negotiable security? Is it not indeed clear, in the light of this testimony of the president of the bank, that he and its directors fully understood the situation as candidly disclosed by Perkins (and as candidly repeated here by Mr. Devries) and were willing to make the loan and take whatever risk went with it, relying upon the personal responsibility of Mr. Clagett and the possession of these non-negotiable securities, coupled with the assurance that they would be exchanged for new bonds when they should be issued, unless the note were then paid off? With eyes opened wide by the information received from Perkins to the fact that Clagett was wrongfully in possession of these bonds, the bank in accepting them as security for the loan took the first step which resulted in the spoliation of the trust; and it was the desire of the Comsioners to regain possession of the bonds which had been issued in violation of duty, which induced them to give to the cashier of the bank the check by means of which it was enabled to consummate the spoliation. The possession of these bonds was acquired by the bank under circumstances which subject them in their hands to all the equities in favor of these appellants as successor's to Clagett's trust, and forbids that they be

regarded as any consideration for any part of the check from the Commissioners to the cashier of the bank.

But if it be assumed for the purposes of argument, that the bank took title to the bonds in good faith, how does the case then stand?

Recurring to the testimony of Mr. Devries, he states that Clagett called on him in June 1892, and said " the county was ready to pay him the money which it owed him, but would not do so unless he produced the bonds. I informed him we could not give up the collateral until the note was paid. After quite a discussion of the matter I told him I thought it could be arranged by the bank getting Mr. Perkins to act in the matter; that we might send him the bonds, and when he received the money, he could turn the bonds over to Mr. Clagett." He also stated " that Clagett assented to this arrangement, and Mr. Perkins agreed, and did act in the matter —that the bank delivered the bonds to Perkins under this arrangement; that he delivered them to the County Commissioners, and received a check in payment of the note, and forwarded the same to the bank, through which Clagett's note was paid." Strangely enough, it does not certainly appear either from the testimony of Mr. Devries, or Mr. Clagett, or in any other manner, whether it was known to Mr. Devries or to any other officer of the bank, at the time the bonds were delivered to Mr. Perkins, that Clagett held them as trustee; but if this was not known to the officers of the bank, Perkins, who became their agent at this stage of the transaction, did know it when Williams, the clerk of the Commissioners, delivered him the check and accompanying statement concurrently with the surrender of the bonds; and the cashier of the bank knew it when he received the check and statement and signed the receipt appended to the statement. What was the discussion between Mr. Devries and Mr. Clagett as to the return of the bonds to the Commissioners, does not appear, and it is not easy to understand why there should have been any difficulty whatever as to their return, if the bonds belonged to Mr. Clagett personally.

If we were at liberty to draw inferences, we might perhaps infer that the capacity in which Mr. Clagett held the bonds, was the subject of that discussion, but we are not warranted in founding our conclusions in this matter upon inference, and we therefore assume the officers of the bank had no knowledge of the fiduciary character in which these bonds were held by Clagett until it was brought home to them by the presentation of the check and statement.    It is urged by the appellee that the money in the Laurel bank was not a trust fund, and that the appropriation by the appellee of the proceeds of the check, was not therefore an invasion of a trust fund, and that the words " as assignee of H. W. Clagett, trustee, for Mrs. E. Bowling," which are part of the check, was a mere memorandum to subserve the convenience of the drawer.    But with this argument we cannot agree.    In the case of *Duckett* v. *The Mechanics' Bank*, decided at the last October term (86 Md. 400), one of the checks in question was as follows:

" LAUREL, MD., September 13th, 1892.

Citizens' National Bank pay to the order of James Scott, cashier, $2,000, two thousand dollars, for deposit to credit of Henry W. Clagett, being the balance of purchase money due him as trustee from John R. Coale.

C. H. STANLEY."

And the words " being the balance of purchase money due him as trustee from John R. Coale," were held not to be an instruction to the Mechanics' Bank as to the account in which the funds should be credited, nor a notification that they were trust funds, and that the Mechanics' Bank discharged its full duty, when it credited the funds as directed by the check, to Clagett's personal account.    The other check in question in that case, was at follows:

" LAUREL, MD., September 17th, 1892.

Citizens' National Bank of Laurel, Maryland, pay to the order of James Scott, Cashier, $2,024.30, two thousand and twenty-four and thirty one-hundredths dollars, to deposit to the credit of Henry W. Clagett, trustee.                    C. H. STANLEY."

And the bank was held liable to restore the amount of that check, because it credited the funds to Clagett personally in violation of the direction of the check to credit them to Clagett as trustee. The Court said: " This was an explicit notification to the bank that Clagett was not the actual owner of the money. It was an equally explicit instruction to the bank, not to place the funds to the credit of Clagett's personal account. It was consequently more than a mere memorandum made for the personal convenience of the drawer of the check."

In the case at bar, the words which the appellee contends are a mere memorandum are not words merely descriptive of the source whence the funds came, as in the first check in the former case, but were used for the express purpose of controlling the *destination* of the proceeds, and constitute an explicit instruction to the bank that it could not accept and receive the proceeds, otherwise than in full discharge of the amount due by the County Commissioners to Clagett as trustee; an instruction quite as imperative in its terms as that of the last check in the former case, and absolutely necessary for the protection of the Commissioners in that transaction. It could not have been more imperative if the check had been made payable to " J. Thos. Smith, Cashier-Trustee," and in legal effect the moment the proceeds were collected, they were held by the bank in trust to be applied to the discharge of the debt due by the County Commissioners to Clagett as trustee. When the bank applied to Clagett's personal debt, the amount due on his note, it committed as clear a breach of trust, as it did in passing the surplus to his personal account, and thus putting it in his power to dispose of it by his personal check. If there could be any doubt as to this conclusion, the receipt signed by the cashier at the foot of the statement would remove any such doubt. That statement set forth a debt due by the County Commissioners to Clagett, trustee. The receipt set forth the payment of that debt under no claim of right by the bank, and the signature of the

cashier made the bank a trustee as effectually as if the cashier had signed as such. We cannot distinguish this case upon any sound principle from that presented upon the last check in the former case. Courts of Equity in guarding trust funds and compelling their restoration by those who have invaded, or who have wrongfully or carelessly aided others in invading them, look to substance and not to form. When the bank learned, as it did upon presentation of the check and statement, if not earlier, that it could not secure the possession of the proceeds of that check otherwise than by receiving them as a trust fund, it was its plain duty to decline the check and stand upon such title to the bonds as it might be able to assert against the county. The surrender of bonds—to which it is perhaps possible it might have been able to assert title, though we think otherwise—cannot create a right to appropriate to its own use money which came into its hands as a trust fund and to which consequently it could have no title except as trustee. To permit the bank to escape liability under the facts of this case would be to renounce the exercise of the established and wholesome powers of equity, which we are forbidden to do. It results from what we have said, that the decree of the Circuit Court must be reversed. If upon proper proof, it can be shown that Clagett has paid out of the proceeds of this check any sums upon the order of Mrs. Bowling or to her, on account of interest due her upon the whole trust fund, or for taxes or other proper charges upon such interest, for which sums he has not been elsewhere allowed in his accounting with her, the bank should have the benefit of all such payments. Our conclusion is that the bank is liable for the sum of $12,568.55, the amount of the check of August 2nd, 1892, with interest from the date of its receipt August 3d, 1892, less such credits as are indicated above when properly ascertained.

The decree dismissing the bill will accordingly be reversed, and the cause will be remanded with directions that a decree be passed in conformity with this opinion, making provision for reference to the auditor of the Court for the purposes stated.

JUDGES BRYAN and BRISCOE did not sit in this case, but having examined the record and briefs authorize me to say that they concur in this opinion.

> *Decree reversed with costs above and*
> *below and cause remanded.*

(Decided June 28th, 1898.)

FOWLER, J., dissented and delivered the following opinion, in which BOYD, J., concurred:

In July 1891, James T. Perkins, who was then the Treasurer of Prince George's County, called at the National Bank of Baltimore. The object of his visit, as stated by the president of the bank, was to ascertain whether the bank would loan to Henry W. Clagett of Prince George's County eleven thousand dollars on $12,500 of four per cent coupon bonds of that county. He stated to the president of the bank that the county owed Clagett quite a large sum of money, and was not in condition to pay him; that the County Commissioners would give Clagett $12,500 of said bonds for the purpose of negotiating the loan, and at the same time he also informed the bank that the Commissioners had not been able to dispose of the bonds, principally for the reason that one of the requirements of the Act authorizing the issue was that the coupons were payable at Upper Marlboro, Prince George's County, and it was necessary that the bonds should accompany the coupons before payment would be made; that the County Commissioners had decided it was useless to attempt to sell them, and had determined to get legislative authority to issue bonds for a like sum to take the place of the first issue, and that when the new issue was made, the county would either give Clagett the new bonds for $12,500 which could be substituted in place of the old bonds as collateral for the loan, or he would pay it off. Perkins represented Clagett to be a man of large means and perfectly responsible outside of the collateral. Perkins was notified that the bank had decided to make the loan as requested by him, and on the 4th of August,

1891, Clagett went to the bank and consummated the transaction by giving his note for $11,000 and as collateral he gave the $12,500 bonds we have already mentioned. On the same day this note was discounted by the bank, and the proceeds placed to Clagett's credit on its books. The note was renewed on February 7th, 1892, for six months, but before it matured the second time, Clagett called, sometime in June, 1892, on the president of the bank and stated " that the county was ready to pay him the money it owed him but would not do so unless he produced the bonds." The bank, however, refused to give up the collateral until the note was paid, but after some discussion it was arranged that the bank would send the bonds to Perkins, *and when he received the money* he was to turn the bonds over to Clagett. This arrangement was agreed to by all parties, and the bonds were delivered to Perkins in pursuance thereof. He handed them to the County Commissioners and demanded a check for them for the bank. The witness Williams, clerk of the Board of County Commissioners, says that on the 1st of August, " we drew the check, made it payable to J. Thomas Smith, Cashier of the National Bank of Baltimore, and delivered it to Mr. Perkins with the statement " showing the amount of county paper of Prince George's County held and owned by Henry W. Clagett as sole trustee for Mrs. Bowling. Perkins gave to the County Commissioners a receipt for their check, describing it as payable to J. Thomas Smith, Cashier,—making no reference whatever to Clagett as trustee, nor to the statement showing the indebtedness of the County Commissioners to him as such. Both Perkins and Williams, the latter the clerk of the Commissioners, appear to have ignored the memorandum on the check and the statement of account which accompanied the check, the former on his receipt, and the latter when in his testimony he described the check as payable to the order of the cashier, etc. But as the form of the check is important in this case, we will give it as it appears in the record:

" Office of the County Commissioners, etc.
" No. 18.

" UPPER MARLBORO, MD., Aug. 1st, 1892.

" The Citizens' National Bank of Laurel. Pay to the order of J. Thomas Smith, Cashier Natl. Bank of Baltimore $12,568.55; twelve thousand five hundred and sixty-eight $\frac{55}{100}$ dollars in full for amount due as assignee of Hy. W. Clagett, sole Trustee of Mrs. E. Bowling from 1874 to 1881 inclusive." This check was duly signed and countersigned. The cashier of the bank receipted for it to Perkins, describing it as " check on the Citizens' National Bank, Laurel, drawn by Prince George's County Commissioners for $12,568.55."

When Clagett first negotiated the loan with the Bank of Baltimore, he was President of the Board of County Commissioners of Prince George's County; but when, in June, 1892, he called upon the bank to deliver to him the county bonds which had been issued under the Act of 1890, chapter 121, he had ceased to be a member of that Board. In the meantime, the Act of 1892, chapter 535 had been passed, repealing and re-enacting the former Act giving power to issue new bonds and requiring that before any new bonds could be issued the whole of the old issue should be counted and destroyed. It is apparent that the new issue could not be put upon the market, and that they were and would continue to be unavailable for the payment of the county paper until the Commissioners could regain possession of the old bonds which were in the hands of the bank. We have already referred to the condition on which the bank relinquished possession of the bonds— namely upon the payment of the money. While Clagett was President of the Board of County Commissioners, on the 10th June, 1891, that Board passed an order allowing to him, as trustee, 1890 bonds for *his* county paper on file for the years 1874, 1875, 1876, 1877, and that these bonds be exchanged for the bonds when issued with six per cent interest from date. In his testimony Clagett says the Commissioners sometime in

1891 passed an order turning over to him the $12,500 bonds but he did not remember whether the order read " in trust " or not.   But we have already seen that the bonds (the very bonds that were hypothecated to the appellee) were in fact passed to him as trustee.   But this transfer of the bonds as well as the delivery of the check, we will presently show were acts of the County Commissioners done without authority and having no effect whatever upon the trust estate.

Under these circumstances, the appellants, who are substituted trustees under the will of John D. Bowling in the place of H. W. Clagett, who has been removed from the position of sole trustee by order of the Circuit Court for Prince George's County, filed a bill in the Circuit Court No. 2 of Baltimore City against said Clagett and the appellee bank to make the latter responsible for the alleged breach of trust of the former in hypothecating said bonds as collateral security for his individual note, and for his alleged fraudulent conversion of the said check and the proceeds thereof.

A decree *pro confesso* was taken against Clagett, but the bank answered fully.   Several questions are presented for our consideration, but the controlling one is whether any part of the trust estate represented by the appellants came into the hands of the appellee bank in the course of the transactions with Henry W. Clagett.

In·the first place, it must be conceded that the appellee had and could have had, under the circumstances, no notice of a breach of trust, if any had been committed, until long after the loan was made and the collateral taken.   In a word, until the check and the accompanying statement were sent to and received by it, there was nothing in the transaction to put it upon inquiry or to raise even a suspicion in the mind of the most prudent person that Clagett was dealing with trust funds.   It was suggested, however, that if the appellee had examined, as it should have done, the Act of 1890 under which these bonds were issued, it would have been apparent that the bonds in question were transferred to Clagett without legal authority.   But if

this position should be conceded, it is difficult to see
what probative force this alleged violation of law would
have in establishing the proposition that the appellee
had notice that the trust estate was being despoiled.
That Clagett and his colleagues were guilty of an official
malfeasance does not in this case necessarily establish
that he was guilty of a breach of trust.   But it is urged
in the second place that even if, under all the circum-
stances of this case, the appellee could in the first in-
stance fairly claim to have been a *bona fide* holder of
the bonds for value, yet the fact that it received the
check which we have transcribed in the first part of this
opinion, and second, the fact that that check was accom-
panied by the statement of the indebtedness of the
county to the trust estate upon which statement the
receipt of the bank was written, are circumstances suf-
ficient to have given it full notice that it was receiving
trust funds from Clagett in payment of his individual
note.

We think, however, that what we said in the recent
case (86 Md. 400) in which the same trustees were ap-
pellants and The National Mechanics' Bank was ap-
pellee, is conclusive so far as the effect of the check
in this case is concerned.   In the case just referred to,
the trustees were seeking to fix responsibility upon the
National Mechanics' Bank for aiding the trustee Clagett
in improperly spending and squandering the trust
money for his individual uses, while here the effort is to
follow trust funds claimed to be in the hands of the
National Bank of Baltimore and paid by Clagett in
satisfaction of his individual debt to it.   In the former
case we held that the bank did no more nor less than
its duty when it placed to the credit of Clagett the
amount of the check of January 13th, 1892, because the
check was written for " deposit to the credit of Henry
W. Clagett," and not to the credit of Henry W. Clagett,
trustee.   And we so held in spite of the fact, that it was
also declared on the face of the check that the fund it
represented " was the balance of purchase money due "
Clagett, *as trustee*.   By the check in this case, drawn

by the County Commissioners of Prince George's County, the money was directed to be paid to the order of J. Thomas Smith, Cashier of National Bank of Baltimore, and this memorandum was added: " in full for amount due as assignee of Henry W. Clagett, sole trustee of Mrs. E. Bowling from 1874 to 1881 inclusive." The money was duly paid to the appellee upon the endorsement of its cashier, and was appropriated in part to the payment of Clagett's note for $11,000 and the balance placed to his credit.

It seems to be perfectly clear that if there were no other circumstance but this memorandum upon the check, it would follow, as we said in the former case, that the memorandum itself imposed no duty on the bank and operated only to subserve the convenience of the drawer of the check. In the present case, however, there is an additional circumstance which was earnestly urged as conclusive proof that the appellee had notice that the check in question represented the funds and was a part of the trust estate of Mrs. Bowling. Now while it may be conceded, for the sake of the argument, though not admitted, that the statement of account in connection with the check and all the other circumstances may have been sufficient to put the bank upon inquiry, and thus make it responsible *if there was in fact and in law any part of the trust estate actually used by Clagett in the payment of his individual indebtedness*, yet it can hardly be contended that if the County Commissioners on their own responsibility and for their own purposes paid this large sum of money to the appellee bank, they were thereby using funds of the trust estate, only because they happened to owe the trust estate that sum of money, and chose to say that the payment was made to an assignee of the trustee. It must be remembered that the check in question and the accompanying statement were sent to the appellee without the authority of the trustee or of the Court having jurisdiction of the trust. It is also conceded that although the appellee is *called* assignee of the trustee, in point of fact it was not such assignee. Now let us see

what really was the transaction between the County
Commissioners and the bank leading to and resulting
in the payment of the money which is here claimed to be
the money of the trust estate.    The facts have been
already stated and it will be necessary only to call atten-
tion to them and remark upon their significance.    In
the first place it has been made apparent, indeed it is
among the first and basic allegations of the bill that
the certificates of indebtedness, commonly called county
paper, constituted part of the assets of the trust estate
in the hands of Clagett.    It is true that in the ninth
paragraph of the bill it is alleged that Clagett, as trus-
tee, being entitled to *said fund* had no right to assign
said claim to the bank or its cashier, or to order the
check in question to be drawn or delivered or transferred
to the latter in payment of Clagett's note.    But there
is not only no proof of this allegation of the assignment
of said claim but it is conceded that, although the bank
is *called* the assignee of Clagett, there was no attempt
to *prove* it.    Nor is there any proof that the claim—the
certificates of indebtedness—was ever transferred to the
county.    And when we remember the circumstances of
the transaction between the bank and the County Com-
missioners it is not remarkable that this is so.    For
the trustee, so far as we have been informed, took no
part in the preparation or delivery of the check to the
bank.    So far as appears by the testimony, he was a
stranger to that part of the transaction, and the County
Commissioners by their clerk acted entirely indepen-
dent of him.    Being then, as alleged in the bill, at that
time in possession of the certificates of indebtedness,
he did not deliver them to the county.    He therefore
retained possession of them in fact.    We have already
shown that there was and could have been no legal
transfer.    The acts of the trustee and of the county were
without the authority of the Court having jurisdiction,
and even if there had been an attempt to transfer the
thing itself—the county paper which is the evidence of
the claim of the estate against the county—such an
attempt would have been abortive.

But again it is apparent that the county which is a debtor of the trust estate, of its own motion by a misrepresentation of fact, that is to say, by calling the bank the assignee of Clagett when in point of fact it was not such assignee, attempted to substitute the bank in the place of its real creditor which was the trust estate—the bank having nothing whatever to do with, and being a stranger to that estate. The asset of the trust estate consisted of county certificates in possession of the sole trustee, Clagett, and that asset remains intact in the hands of the substituted trustees so far as we know— not having by any valid act, or indeed by any act valid or invalid, rightful or wrongful, of the trustee been converted into money, or into chattels of another description. Certainly it needs no authority to show that the trustee, without the order of the Court having jurisdiction of him and the trust estate, had no power whatever to accept the bonds of 1890 in place of the county paper. Nor is it contended that the transfer by him of these bonds to the appellee operated as payment. All the evidence shows that they were given and taken as collateral. And even if he had accepted them as payment, such acceptance could have had no binding effect, because done without authority. And so also with the payment made by the County Commissioners. It was equally without authority and without effect upon the trust estate. It would be a most dangerous doctrine to hold that such an unauthorized act of the debtor of the trust estate, to wit, the payment by the county to the appellee, operates as a valid payment of the claim of the trust estate against the county. It happens in this case that the appellee is amply able, if required, to pay the money to the trust estate, but generally the reverse would be the case. The result would be that the claim against the county which was perfectly good would become worthless—and that too by the unauthorized act of the debtor. Neither the trustee nor his bond could be held, for it is shown that he neither authorized nor ratified the payment. If, therefore, there has been any conversion or attempt to convert the asset of the trust

estate into money, such conversion or attempt was the act of the debtor without the knowledge of the trustee. There is no room, therefore, for the application of the well-settled equity doctrines relating to the following of trust property, and the ratification of the wrongful act of the trustee by the beneficiaries of the trust.

Our conclusion is, therefore, that no part of the trust estate has been converted into money and used by Clagett in the payment of his note held by the appellee, and that the asset—the county paper which was alleged to have been converted and misapplied—has not been so converted and misapplied and that therefore the bill filed by the appellants was properly dismissed as against the appellee bank. This conclusion not only does not violate any principle of equity, but accords with the justice of the whole case. The bank in good faith loaned its money to Clagett and in equally good faith gave up the collateral upon the understanding that the money so advanced was to be repaid. And now that it has been repaid, to require the payment of it by the bank to the trust estate would seem almost like a justification—certainly it would be a practical approbation, of the manner in which the representative of the county secured possession of the hypothecated bonds. True, it may be that no title to them could have been successfully asserted against the county, yet the bank held them innocently and for value. The county wanted the bonds and it may be it could have recovered possession of them by an action at law, but it did not pursue that course. The county having through its officers and agents obtained possession of the bonds under the circumstances already stated, the bank was entitled upon every principle of fair dealing, to have the money paid to it by the county. And as we have already said the money which was received by the bank was in fact the money of the county and not that of the trust estate. Therefore no question can arise out of the payment thereof except as between the county and the bank. And as to the bonds, it cannot be said that they were part of the trust estate. All the testimony shows that

they were not passed to the Trustee Clagett in payment of the claim of the trust estate, for at the time he received them from the county, it is conceded the bonds could not be negotiated or sold. At the most they were only intended as temporary security, and were subsequently destroyed in accordance with the provisions of the Act of Assembly. It not being in the power of the appellants as trustees to elect to take these worthless bonds in the place and payment of valid county paper, they have never even attempted to do so. Nor have the beneficiaries, who alone have the right to make such election, ever exercised or attempted to exercise it. The appellants have filed a bill to enforce their claim against the County Commissioners of Prince George's County and whatever may be the result of that proceeding, the appellants should be denied relief in this according to every principle of equity and fair dealing.

JUDGE BOYD authorizes me to say that he agrees with the views here presented.